IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| JAMES O. BAXTER, II, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:15cv633 (JCC/IDD) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

### **M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendant United States of America's Motion for Partial Summary Judgment [Dkt. 82]. Defendant seeks summary judgment on Plaintiff James O. Baxter, II's medical malpractice claim insofar as it alleges Defendant's failure to diagnose and treat Plaintiff's Peyronie's Disease exacerbated Plaintiff's condition and resulted in permanent damage to Plaintiff's genitalia. Defendant also moves for summary judgment on Plaintiff's claims for intentional and negligent infliction of emotional distress. Also before the Court is Plaintiff's Motion in Limine [Dkt. 88], which seeks a ruling as to whether the United States may withhold any sum to be paid to Plaintiff in connection with this case and apply it to Plaintiff's outstanding restitution debt. For the reasons that follow, the Court will grant Defendant's Motion for Summary

Judgment and deny Plaintiff's Motion in Limine without prejudice.

## I. Background

The following facts are drawn largely from Defendant's listed Undisputed Material Facts ("UMF"). *See* Mem. in Supp. of Mot. for Partial Summ. J. [Dkt. 83] at 2-8. Plaintiff does not specifically contest or attempt to rebut any of the following.

On June 5, 2006, the United States District Court for the District of Columbia sentenced Plaintiff to 120 months of incarceration. UMF ¶ 1. Plaintiff served his prison term at the Federal Correctional Institution at Petersburg (FCI Petersburg) from August of 2006 to November of 2014. *Id.*

Beginning in late 2009, Plaintiff began to experience the symptoms of Peyronie's Disease, a medical condition that results from a buildup of inflammatory plaque in the penis. *Id.* ¶¶ 2, 7. The disorder causes a painful curvature of the penis, sometimes resulting in sexual dysfunction. *Id.* ¶ 2.

Peyronie's Disease progresses in two stages: the "active" phase and the "stable" phase. *Id.* ¶ 3. The active phase lasts 12 to 24 months, during which plaque forms in the penis, resulting in penile pain and increasing curvature. *Id.* During the stable phase, penile pain subsides and the curvature stabilizes. *Id.*

Treatment for Peyronie's Disease depends on the phase of the condition. During the active phase, treatment is generally limited to over-the-counter antioxidants such as fish oil and Vitamin E meant to reduce the size of the penile plaque deposits. *Id*. ¶ 4(a). Recent medical research has cast doubt on the efficacy of this method, and the American Urological Association has, as of 2015, ceased recommending antioxidants for the treatment of Peyronie's Disease. *Id.* Beyond this, men suffering from Peyronie's Disease may take over-the-counter painkillers such as ibuprofen during the active phase to reduce their discomfort. *Id*.

During the stable phase, Peyronie's Disease may be treated through more invasive means – surgery or injections that can reduce the curvature of the penis. *Id*. ¶ 4(b). Generally, these treatments are reserved for severe cases. *Id.* One such treatment, approved by the FDA in December of 2013, involves injecting collagenase directly into penile plaques. *Id.* This treatment, however, has been found on average to produce limited improvement in penile curvature, and is approved only for use on patients suffering severe erectile curvature exceeding thirty degrees. *Id.*

Between December of 2009 and July of 2011, Plaintiff made numerous complaints regarding his penile pain to BOP medical staff. *Id*. ¶ 7. Defendant disputes that these

complaints were such that BOP medical staff had notice of Plaintiff's condition. *Id*. ¶ 7 n.1. Defendant acknowledges, however, that there exists a material dispute of fact on this point that must be resolved in Plaintiff's favor for purposes of the present Motion. *Id*.

Plaintiff's own research led him to believe that he suffered from Peyronie's Disease in March of 2010. *Id*. ¶ 7. At some point after he became symptomatic, Plaintiff briefly took fish oil of his own accord, but experienced no improvement in his condition. *See id*. ¶ 7(b); Df. Exh. C [Dkt. 83-1] at ECF# 30. Beginning in July of 2011, Plaintiff began to take Vitamin E, but his condition only worsened. *See* UMF ¶ 7(b) n.3; Df. Exh. D [Dkt. 83-1] at ECF# 46.

Despite Plaintiff's complaints, Plaintiff was not permitted to see an urologist until September 15, 2011 – nearly two years after the onset of his symptoms. *See* UMF ¶ 9. The urologist, Dr. Harry Bigley, confirmed that Plaintiff suffered from Peyronie's Disease and recommended that Plaintiff continue to take Vitamin E. *Id*. Dr. Bigley also noted the presence of blood in Plaintiff's urine – apparently unrelated to Peyronie's Disease – and suggested that Plaintiff schedule a follow up visit for the following month. *See* Df. Exh. E [Dkt. 83-1] at ECF# 55.

Plaintiff, however, was not able to schedule such a visit. Dr. Bigley's contract to provide medical services at FCI Petersburg terminated soon after Plaintiff's initial appointment. *See* Df. Exh. R [Dkt. 83-1] at ECF# 94. As a result, Plaintiff was not able to schedule another appointment with an urologist until April 18, 2012, when Plaintiff visited the newly contracted urologist Dr. Duck. *See* Df. Exh. F [Dkt. 83-1] at ECF# 57. Dr. Duck found that Plaintiff suffered from "mild Peyronie's Disease with minimal plaque on left lateral aspect of penis," and recommended that Plaintiff continue to take over-the-counter antioxidants. *Id*.

Plaintiff continued to see Dr. Duck throughout the following two years. *See* UMF ¶ 10. In addition to antioxidants, Dr. Duck would eventually make two additional recommendations. First, Dr. Duck ordered a CT scan of Plaintiff's penis "because [Plaintiff] wanted a documentation of the degree of Peyronies [sic] plaque that he has in his penis." Df. Exh. I [Dkt. 83-1] at ECF# 64. The CT scan was apparently bungled, and Dr. Duck recommended an ultrasound of Plaintiff's penis be taken because Plaintiff remained "quite adamant . . . that he want[ed] some documentation" regarding the progress of his condition. *Id.* Plaintiff's medical expert Dr. Victor Herry testified that such imaging is "not necessary" to diagnose or

treat Peyronie's Disease, and that he has never himself ordered such imaging.  *See* Df. Exh. Y [Dkt. 83-2] at ECF# 84.

Second, on February 20, 2014, Dr. Duck recommended that Plaintiff receive collagenase injections to treat his Peyronie's Disease.  Df. Exh. M [Dkt. 83-1] at ECF# 74.  FCI Petersburg's Utilization Review Committee, however, did not approve the treatment, finding on February 26, 2014 that the injections were "elective or not medically necessary."  Df. Exh. N [Dkt. 83-1] at ECF# 76.  Plaintiff had no further appointments with Dr. Duck after this.

Plaintiff was released from FCI Petersburg in November of 2014.  UMF ¶ 12.  On April 23, 2015, Plaintiff visited Dr. Mark Rosenblum, who found that Plaintiff suffered from penile curvature less than thirty degrees and determined that Plaintiff's "curvature [was] mild enough that it [did] not warrant treatment at [that] time."  Df. Exh. P [Dkt. 83-1] at ECF# 85.  On December 2, 2016, Plaintiff consulted with Dr. Nicholas Lailas regarding the collagenase injections recommended by Dr. Duck, and after discussing their potential complications, declined to pursue that course of treatment.  Df. Exh. Q [Dkt. 83-1] at ECF# 89.

Plaintiff initiated this action on April 18, 2015.  On December 21, 2016, Plaintiff was granted leave to file his Second Amended Complaint, alleging claims for medical

6

malpractice, intentional infliction of emotional distress, and negligent infliction of emotional distress. Defendant filed the instant Motion for Partial Summary Judgment [Dkt. 82] on April 7, 2017. Having reviewed the associated filings and heard the arguments of counsel, the Motion is now ripe for disposition.

## II. Legal Standard

"Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, 'no material facts are disputed and the moving party is entitled to judgment as a matter of law.'" *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (quoting *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir.2003)). An unresolved issue of fact precludes summary judgment only if it is both "genuine" and "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on that issue. *Id*. at 248. It is material if it "might affect the outcome of the suit under the governing law." *Id*. "In the end, the question posed by a summary judgment motion is whether the evidence 'is so one-sided that one party must prevail as a matter of law.'" *Lee v. Bevington*, 647 F. App'x 275 (4th Cir. 2016) (quoting *Anderson*, 477 U.S. at 252).

7

## III. Analysis

### A. Plaintiff's Medical Malpractice Claim

Under Virginia law, "[i]n a medical malpractice action, 'a plaintiff must establish not only that a defendant violated the applicable standard of care, and therefore was negligent, the plaintiff must also sustain the burden of showing that the negligent acts constituted a proximate cause of the injury or death.'" *Bitar v. Rahman*, 272 Va. 130, 137 (2006) (quoting *Bryan v. Burt*, 254 Va. 28, 34 (1997)). Where causation is concerned, Virginia follows a "but for" Rule whereby the Plaintiff must demonstrate that the alleged medical negligence "produce[d] that event," and "without which that event would not have occurred." *Fitzgerald v. Manning*, 679 F.2d 341, 348 (4th Cir. 1982) (quoting *Coleman v. Blankenship Oil Corp.*, 221 Va. 124, 267 S.E.2d 143, 147 (1980)). "[E]xpert opinion is of course the prime – indeed usually the only – way to prove medical causation." *Crinkley v. Holiday Inns, Inc.*, 844 F.2d 156, 164 n.2 (4th Cir. 1988); *see also Bitar*, 272 Va. at 138 ("'[E]xpert testimony is ordinarily necessary to establish the appropriate standard of care, to establish a deviation from the standard, and to establish that such a deviation was the proximate cause of the claimed damages.'") (quoting *Perdieu v. Blackstone Family Practice Ctr., Inc.*, 264 Va. 408, 420 (2002)) (alteration in original). A medical expert must testify that to

a "reasonable degree of medical probability," the alleged medical malpractice caused the Plaintiff's injury. *Bitar*, 272 Va. at 138 (quoting *Pettus v. Gottfried*, 269 Va. 69, 78 (2005)).

For purposes of this Motion, the Court assumes that (1) Plaintiff put BOP medical staff on notice of his incipient Peyronie's Disease in December of 2009; (2) BOP medical personnel failed to diagnose or treat Plaintiff's condition until September 15, 2011; and (3) this failure breached the applicable standard of medical care. Even accepting those propositions, however, Plaintiff has adduced no evidence that earlier detection and treatment would have prevented the degeneration of his disease.

Plaintiff's Peyronie's Disease stabilized at some point after September 15, 2011. *See* Df. Exh. P [Dkt. 83-1] at ECF# 85. Accordingly, the disorder was in its active phase while untreated between December of 2009 and September 15, 2011. It is undisputed that treatments for Peyronie's Disease during its active phase are few and generally of limited efficacy. See Df. Exh. V [Dkt. 83-2] at ECF# 41-42. Indeed, the American Urological Association has determined that the methods of treatment commonly employed for Peyronie's Disease during the period in question were utterly ineffective. *See id.* at 42. It is further undisputed that Plaintiff did not respond to the most

9

common of these treatments once he began receiving it. *See* UMF ¶ 7(b).

Plaintiff rejoins that he "was denied the opportunity to be amongst the census of those successfully treated because of the government's disinterest in providing him an appropriate assessment until 2012." Opp. [Dkt. 85] at 8. The loss of a slight possibility of a better outcome, however, does not establish proximate cause. Rather, a plaintiff must demonstrate that the alleged malpractice *more likely than not* caused his or her injury. *See Murray v. United States*, 215 F.3d 460, 463-65 (4th Cir. 2000). Given the evidence before the Court, Plaintiff cannot prove this causal link.

Plaintiff's medical expert Dr. Herry stated that the only treatments that could have been provided Plaintiff during the period between December of 2009 and September 15, 2011 were "the same medications that were provided subsequent to July 2011." Df. Exh. Y [Dkt. 83-2] at ECF# 86. Dr. Herry conceded that "no one knows whether or not if what he received in 2011 could have reduced the plaque in 2010." *Id*. Similarly, Plaintiff's other medical expert, Dr. Lailas, conceded during his deposition that treatments for Peyronie's Disease during its active phase are quite limited, and suggested that he would largely "wait . . . to treat" a patient "until they get in the quiescent [or stable] phase." *See* Df. Exh. T [Dkt. 83-2] ECF#

10

19. Indeed, Dr. Lailas went so far as to concede that he did not believe any delay in treatment caused Plaintiff physical damage:

> Q. Okay. And other than the psychological benefit of diagnosis, is there anything else that you believe resulted from the failure to diagnose?
>
> A. *I don't think [Plaintiff] was damaged or hurt in any way*. But I think that he could have received the oral therapies. And that's what takes away some of the pain and discomfort because they're – they're anti-inflammatories and they're antioxidants.

*Id*. at ECF# 24 (emphasis added). With respect to causation, the strongest statement in Dr. Lailas' expert report is that Plaintiff "was denied potentially helpful therapies and treatments." Df. Exh. S [Dkt. 81-2] ECF# 4. Dr. Lailas, however, does not identify what additional therapies might have been provided Plaintiff beyond those discussed above. Neither Dr. Lailas nor Dr. Herry testifies that, to a reasonable degree of medical certainty, failure to diagnose and treat Plaintiff's disorder prior to September 15, 2011, exacerbated Plaintiff's condition and caused Plaintiff's physical deformity.

Similarly, Plaintiff identifies no malpractice that might have injured him after he was diagnosed and his treatment began. While Plaintiff complains of administrative mishandling of his case, this had no appreciable impact on Plaintiff's treatment. Beginning with Plaintiff's first visit to an

11

urologist, Plaintiff's treatment largely consisted of over-the-counter antioxidants.  During the purported delays between urological visits, this treatment continued without interruption.  Similarly, while Plaintiff notes that he encountered difficulties in obtaining medical imaging of his genitals, the record indicates that such imaging is neither medically necessary nor common for the treatment of Peyronie's Disease.  *See* Df. Exh. Y [Dkt. 83-2] at ECF# 84.  There is no evidence any delay in obtaining medical imaging exacerbated or otherwise affected Plaintiff's disorder.

Finally, while Plaintiff was denied collagenase injections to treat his Peyronie's Disease, this did not worsen Plaintiff's disorder.  Such injections are appropriate only once the progression of Peyronie's Disease has arrested, *see* Df. Exh. V [Dkt. 83-2] at ECF# 42, and Plaintiff remains able to seek this treatment if he so chooses.  The evidence before the Court is that Plaintiff is in fact a poor candidate for this treatment, and has declined to pursue it since his release from FCI Petersburg.  *See, e.g.*, Df. Exh. Q [Dkt. 83-1] at ECF# 89.  Regardless, there is no expert testimony suggesting that the decision to deny Plaintiff collagenase treatments breached the applicable standard of care.

In sum, the undisputed evidence before the Court shows that Peyronie's Disease is difficult to treat.  During the

active phase of the disease, there is no effective treatment that provides a substantial chance of arresting the progress of, or curing, the disorder. While Plaintiff's Peyronie's Disease may have gone undiagnosed for nearly two years, expert testimony and Plaintiff's own experience belie the suggestion that this delay exacerbated Plaintiff's disorder or caused his physical deformity. The same causal link is missing with respect to Plaintiff's treatment after his diagnosis. There is simply little to be done for a mild case of Peyronie's Disease like Plaintiff's. *See* Df. Exh. P [Dkt. 83-1] at ECF# 85; Df. Exh. V [Dkt. 83-2] at ECF# 42-43. Accordingly, the Court will enter summary judgment for Defendant on Plaintiff's medical malpractice claim insofar as it alleges Defendant's failure to diagnose and treat Plaintiff's Peyronie's Disease exacerbated Plaintiff's condition and resulted in permanent damage to Plaintiff's genitalia.

**B. Plaintiff's Infliction of Emotional Distress Claims**

Defendant moves for summary judgment as well on Plaintiff's claims for intentional and negligent infliction of emotional distress. Plaintiff's Opposition does not address Defendant's arguments with respect to either. At the hearing on this matter, Plaintiff's counsel stated that Plaintiff would abandon both claims. Accordingly, the Court will enter summary

13

judgment for Defendant on Counts II and III of Plaintiff's Second Amended Complaint.

### C. Plaintiff's Motion in Limine

Also before the Court is Plaintiff's Motion in Limine [Dkt. 88] requesting that the Court "issue a ruling on the validity of the government's claimed lien on the Plaintiff's potential recovery." Defendant has notified Plaintiff that it intends to withhold any amount awarded to Plaintiff in this matter and apply it to the outstanding balance of the $4 million restitution order entered against Plaintiff in connection with his criminal conviction. As the Court finds that the Motion is premature, the Court will deny Plaintiff's Motion without prejudice to Plaintiff's ability to raise the issue, if necessary, after trial.

### IV. Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion for Partial Summary Judgment as to Plaintiff's medical malpractice claim insofar as it alleges that Defendant's failure to diagnose and treat Plaintiff's Peyronie's Disease exacerbated Plaintiff's condition and resulted in permanent damage to Plaintiff's genitalia. The Court will further grant Defendant's Motion with respect to Plaintiff's negligent and intentional infliction of emotional distress claims. Accordingly, the only issues remaining for trial are

14

whether the failure of BOP healthcare professionals to diagnose Plaintiff's Peyronie's Disease deviated from the applicable standard of care, and what damages, if any, Plaintiff is entitled to recover for any resulting mental distress.  The Court will deny Plaintiff's Motion in Limine without prejudice.

    An appropriate order will issue.

|  |  |
|---|---|
| April 27, 2017<br>Alexandria, Virginia | /s/<br>James C. Cacheris<br>UNITED STATES DISTRICT COURT JUDGE |